UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**BRENNAN CAIN,**

Case No.:

Honorable:
Magistrate:

Plaintiff,

v.

**UNIVERSITY OF MICHIGAN-DEARBORN,**
**UNIVERSITY OF MICHIGAN.**

Defendant.
_______________________________________________/

MEROUEH & HALLMAN, PLLC
Attorneys for Plaintiff
Zachary A. Hallman, P78327
Odey K. Meroueh, P76460
14339 Ford Rd., 2nd Floor
Dearborn, MI 48126
(313) 582-7469
zhallman@mhatlaw.com
okm@mhatlaw.com
_______________________________________________/

**COMPLAINT AND JURY DEMAND**

Brennan Cain ("PLAINTIFF"), for her Complaint against the University of Michigan-Dearborn AND University of Michigan ("DEFENDANTS"), states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Brennan Cain is a resident of Belleville, in the County of Wayne, State of Michigan.
2. This suit is brought and jurisdiction lies pursuant to 29 USC § 2601 et seq. of Family Medical Leave Act of 1993 (FMLA).
3. Defendant operates throughout the State of Michigan, including in this instant district.
4. The events giving rise to this action occurred mostly in the City of Dearborn, Wayne County, Michigan.
5. At all relevant times, Plaintiff was and is an eligible employee as defined by the FMLA. 29 USC 2611(2). 29 CFR 825.110-111.
6. At all relevant times, Defendant was and is an employer as defined by the FMLA. Id.
7. This Honorable Court has jurisdiction pursuant to 28 USC § 1331. 29 USC 2611(4). 29 CFR 825.104-105.
8. All the discriminatory employment practices alleged in this complaint occurred within the State of Michigan and by Defendants or one of either of its agents, affiliates, subsidiaries, parent organizations or some other party the actions of which would hold Defendants liable.

9. Defendant University of Michigan-Dearborn is a university with its office and principal place of business in Dearborn, Michigan.

10. The University of Michigan is a university with its office and principal place of business in Ann Arbor, Michigan.

## FACTUAL ALLEGATIONS

11. Plaintiff, at all relevant times to her allegations, was an individual who met the standards set forth under the FMLA as possessing a serious health condition, suffering from the condition of Vestibular Migraine Disorder ("VMD") from medical staff employed by Defendants.

12. Defendant's own medical specialists have offered multiple diagnoses holding that Plaintiff's condition clearly qualifies as a serious health condition under the FMLA.

13. Plaintiff was hired by Defendants in 2008 as a Secretary Intermediate at its office located at 3011 CASL until she got moved in 2016 to 2002 CASL.

14. In or around 2013, Plaintiff began experiencing bouts of dizziness due to nerve damage in her neurological balance center.

15. Plaintiff's increasing bouts of dizziness exacerbated her VMD, although she was not diagnosed until later, as laid out in more complete detail below.

16. The Defendants, **at this time, in 2013** accommodated any and all jobsite accommodates that Ms. Cain requested, and her condition on each occasion improved without further incident.

17. In or around 2015, as a result of another more serious episode of her condition, Plaintiff began seeking further accommodations at her work environment, and as Defendants complied, Plaintiff's condition improved.

18. Shortly after Rita Gordon began her employ with Defendants and assumed her role as Plaintiff's supervisor, Plaintiff began to experience her VMD symptoms flaring up again in a severe manner.

19. In or around June of 2016, as her condition worsened under the increased scrutiny and hostile environment fostered by Ms. Gordon, Plaintiff began seeking further and more serious medical treatment for her condition and took approved Family Medical Leave for such doctor's visits and prescribed-days-off.

20. At this time and at all relevant times, Plaintiff provided notice to Defendant in advance of leaves as soon as she was able, in compliance with her burden under the FMLA. <u>29 CFR § 825.302(a)-(b), .303(a)-(b).</u>

21. After Ms. Gordon became Plaintiff's supervisor, Defendant began denying Plaintiff's requests for leave to treat her condition.

22. At no other time previously in her employment with Defendant was Plaintiff ever denied a request for time off to treat her condition.

23. In a viscious cycle, after Ms. Gordon became Plaintiff's employer, Plaintiff's condition would worsen as her treatment from Defendants - and specifically Ms. Gordon - grew increasingly hostile, which necessitated the need for leave from the office environment to treat her condition, however, such requests would then be denied by Ms. Gordon and other agents of the Defendant.

24. As seen in a later letter that Plaintiff wrote to Defendants detailing her requests for accommodation, Plaintiff's requests for simple accommodations which were recommended and known to be able to improve her condition, and which Defendants had accommodated in the past, were all denied to Plaintiff, presumably all at Ms. Gordon's direction. **Please See Exhibit A, February 22, 2017 correspondence from Plaintiff to Ms. Gordon.**

25. In conjunction with Plaintiff's primary treating doctor, when Mrs. Cain returned to work in July 2016, the Defendants' ergonomic specialist Sue Bade had recommended a number of rather minute fixtures to support a modified work environment.

26. One of the main recommendations was to either turn off the bright fluorescent lights directly above Plaintiff's work desk or install special covers made to dim those lights.

27. The covers were ordered, as they had been when Plaintiff's condition had arose in the past during her employ with Defendants, yet were simply never installed.

28. Ms. Gordon failed to follow up with any of the recommendations she received on Plaintiff's behalf and went so far as to prevent the light covers from being put up.

29. Plaintiff's absences from work were medically supported by Defendants' *Work Connections* division until the date of September 28, 2017*,* when Plaintiff learned that no longer was her condition supported by *Work Connections*.

30. Plaintiff's condition gradually but consistently deteriorated and eventually she was referred to a vestibular specialist, Dr. Emily Z. Stucken.

31. Additionally, Ms. Cain was treated by another neurologist employed by the Defendants, Dr. Aymen.

32. Dr. Aymen supported Dr. Stucken's findings regarding Plaintiff's condition of VMD, and recommended that Plaintiff go through cranial-sacral physical therapy.

33. As a result of the delays involved in meeting with a University Neurologist, Plaintiff was referred to Dr. Silverman, a neurologist without employment-relation to Defendants.

34. Dr. Silverman of course not only reaffirmed Plaintiff's diagnosis, but additionally diagnosed Ms. Cain with post-traumatic stress disorder due to the environment at her workplace.

35. If at this time or at any relevant time in her employ for Defendant, Plaintiff did not qualify for FMLA leave, such was because of the reduced hours she was capable of working the more her condition worsened under Ms. Gordon.

36. Despite her medical care team not giving clearance to return to work full-time, the University/*Work Connections* consistently rejected the medical documentation and opinions, from University of Michigan Physicians, that Plaintiff was even disabled.

37. Plaintiff returned to work on January 9, 2017, but was still provided none of the accommodations that she requested and which the University's own employed specialist recommended and supported.

38. Plaintiff's condition, which, briefly, is directly connected to and impacted by anxiety and anxiety-inducing events and environments, manifested into a severe, debilitating attack.

39. Naturally, this forced Plaintiff to immediately leave work after notifying her supervisor and again requesting her accommodations of an alternative work schedule and workplace accommodations.

40. Campus safety escorted Plaintiff out of the building, where she was picked up by her husband.

41. Later that same day, January 9, 2017, Plaintiff received an e-mail from *Work Connections* informing that Plaintiff's suggested reduced work schedule, proposed by Dr. Stucken, was denied.

42. On January 17, 2017, Plaintiff Received an e-mail from Kelly Schester stating that HR has received notification from Plaintiff's department that she was out of the office due to a medical issue.

43. Plaintiff was told to have FMLA forms completed and returned to the HR office.

44. The next day, Plaintiff received an email from Ms. Gordon, stating that since Plaintiff had been out of the office of three days, FMLA paperwork was being sent to her, to which Plaintiff responded, copying Keisha Blevins, Deborah Kamber and Martin Hershocok on the email, stating that her physician would be in communication with Defendant regarding her condition.

45. On February 1, 2017 Plaintiff was administered an Independent Medical Examination ("IME") by Defendants, despite, again, there being no dearth of medical support for her condition from several University of Michigan physicians and specialists.

46. On February 13, 2017, Plaintiff received an e-mail from Rita Gordon that Work Connections and HR will permit Plaintiff to return to work as of Monday, February 13, 2017 at 8:00 a.m. with no restrictions, advising that Plaintiff return on Wednesday, February 15, 2017, and that failure to do so may result in disciplinary measures.

47. Plaintiff responded promptly, once again explaining that her physician advised that she could not return to work at that time, and on February 15, 2017 she provided to Defendants a temporary doctor's note providing proof of treatment for her disabling condition.

48. Naturally, Ms. Gordon remained undeterred and on February 16, 2017 she emailed Plaintiff stating that Plaintiff's doctor's note that was emailed on February 16, 2017 was insufficient and that Plaintiff was therefore expected to report to work on Friday, February 17, 2017 at 8 a.m.

49. On that same date, Plaintiff received an email from Wanda Yenkel of *Work Connections* explaining that Plaintiff's doctor's note of 2/16/2017 was insufficient because the note contained no new medical information

than previous doctor's notes that Plaintiff had provided.

50. Plaintiff forwarded the message from Ms. Yenkel to Dr. Stucken, who immediately contacted Work Connections, as evidenced by an email Plaintiff received from Ms. Yenkel on February 17, 2017;

- "Dr. Stucken contacted us today. She reports referring you to a neurologist. She said that as you told her that your current work environment exacerbates your symptoms and makes you unable to perform your occupational duties, she has taken you off work to allow you time to obtain treatment from the neurologist. This information does not change the findings of the IME. We are unable to support your time away from work."

**Email correspondence from Defendant to Plaintiff on 2/17/2017.**

51. On February 21, 2017, Plaintiff was sent a disciplinary notice by Ms. Gordon, which directed Plaintiff a return-to-work date of Thursday February 23, 2017 at 8:00 a.m., knowing that Brennan would not be able to report at that time.

52. Plaintiff, at this point not knowing what else she could do, provided in response to Ms. Gordon a detailed timeline of the last year of discrimination and failure to accommodate exhibited by Defendant. **Exhibit B.**

53. Plaintiff's response did not trigger a change in the treatment she continued to suffer at Defendant's hands.

54. On March 3, 2017, Plaintiff met with Ms. Anita Green, Institutional Equity & Inclusion Officer, and lodged a complaint alleging that she was suffering discrimination.

55. On or around March 6, 2017, Plaintiff's treating specialist, Dr. Emily Stucken, submitted new paperwork to be sent to Defendant detailing the extent of Plaintiff's condition, Vestibular Migraine Disorder and explaining once again that Plaintiff's condition worsened with stress, exponentially, but consistently stressing that Plaintiff's condition could be accommodated, reasonably.

56. Dr. Stucken advised that Plaintiff was a fall-risk at work and was liable to experience intense dizziness and/or migraines resulting from over-exposure to certain light and/or significant visual activity, but Dr. Stucken was firm in her recommendation that Plaintiff's condition at that time could still be accommodated with minimal ergonomic and scheduling accommodations that the Defendant was known to practice. Shortly following her diagnosis. Those accommodations were specifically, but not limited to, "Avoidance of fluorescent and bright lights, crowded areas, **not working on a computer for more than 2 hours at a time**, using her cane and **a reduced work schedule** (these are designed to avoid various triggers that exacerbate Plaintiff's vestibular migraine)." **Exhibit C**.

57. Neither Mrs. Cain's previous management nor Work Connections had any issue with her working from home when deemed necessary or even helpful.

58. Regardless of the documentation and recommendation submitted directly to Plaintiff's management, Rita Gordon on numerous occasions accused Plaintiff of essentially lying about her condition to evade work duties, and willfully ignoring the medical support in place from not only Plaintiff's treating physician but the Defendants' own employed specialist as well.

59. Rita Gordon consistently and fervently raised issue with Plaintiff's requests for a reduced work schedule, despite the fact that Mrs. Cain experienced severe physical and mental difficulty in her effort to acquiesce to Gordon's demand that she work 40-hours per week, and, as stated, such requests had always been accommodated in the past.

60. In sharp contrast to the Defendants' Standard Practice Guide, cited below, Rita Gordon repeatedly sought disciplinary measures against Plaintiff for her allegedly disappointing attendance, whilst continuing to aggressively reject any sort of accommodation.

a. "MEDICAL PROBLEMS: If performance, **including attendance**, is adversely affected by a medical problem **for which there is**

> **acceptable medical evidence and the employee is following prescribed treatment, disciplinary action is not appropriate**. However, termination because of inability to perform the essential functions of one's position may be considered on a case by case basis." (SPG 201.12, section II.II.I)

61. On March 15, 2017 the Defendants terminated Plaintiff.
62. However, in the same termination-letter, inform Plaintiff that she is being considered as terminated on January 9, 2017, demonstrating the Defendant's utter disregard for its legal duty under the FMLA and other related laws.
63. As shown in the above and in the attached, Plaintiff has a treatable neurological condition that gets worse with stress and anxiety.
64. This condition was accommodated by Defendants for years and with such accommodation, Plaintiff was consistently a model employee who take immense pride in her job.
65. Quite simply, when Ms. Gordon assumed decision making power over Plaintiff, the accommodations stopped, and Plaintiff's condition worsened exponentially.

66. This continued despite Defendants' own specialists recognizing and giving validity to Plaintiff's condition and supporting Plaintiff's requests for accommodation.

**COUNT I**
**DISCRIMINATION/RETALIATION IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT**

67. Plaintiff incorporates by reference herein the allegations contained in the foregoing paragraphs.

68. Plaintiff is a qualified individual under the FMLA, by having a serious medical condition as defined by the FMLA and possessing such condition at all relevant times to the allegations in this Complaint.

69. Defendants each have more than fifty employees.

70. Plaintiff had been employed by Defendants for well over a year and had worked more than 1,250 hours in the year preceding the onset of her leave request in 2016.

71. Plaintiff had on many occasions in the past, before working for Ms. Gordon, taken FMLA qualifying leave to treat her condition and did so without issue.

72. Defendants failed to live up to its burden under the FMLA of providing

leave to a qualifying employee with a serious medical condition.

73. Defendant's failure to do so severely exacerbated Plaintiff's condition.

74. Defendants retaliated against Plaintiff for taking FMLA leave by denying her accommodations necessary for her disability, harassment, and ultimately, termination.

75. As a direct and proximate result of Defendants' actions, Plaintiff has suffered loss of past and future wages, loss of employment benefits and opportunities, and other pecuniary and non-pecuniary losses.

**PRAYER FOR RELIEF**

Plaintiff prays for relief as follows:

a. An award of damages, which includes, but is not limited to back pay, front pay, lost wages, lost employee benefits, attorney fees and costs, and compensatory damages, and an appropriate award of interest;

b. Liquidated damages where appropriate;

c. All damages and other relief afforded by law;

d. An award of punitive damages where appropriate in an amount to be proven at trial;

e. Attorneys' fees, interests, and costs as provided by law; and

f. Such other further relief as the Court may deem just and equitable.

Respectfully submitted,

DATED: 1/9/2019

BY: /s/ *Zachary A. Hallman*
ZACHARY A. HALLMAN (P78327)
Attorney for Plaintiff
14339 Ford Rd., 2nd
Floor Dearborn, MI
48309
(313) 582-7469

**DEMAND FOR JURY TRIAL**

Brennan Cain ("PLAINTIFF"), by and through her attorneys, Meroueh & Hallman, LLP, hereby makes a demand for a jury trial in this matter.

Respectfully submitted,
Meroueh & Hallman, LLP

Dated: January 9, 2019

BY: /s/ *Zachary A. Hallman*

ZACHARY A. HALLMAN (P78327)
Attorney for Plaintiff
14339 Ford Rd., 2nd
Floor Dearborn, MI
48309
(313) 582-7469